UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA SANDERSON,<br><br>Plaintiff,<br><br>v.<br><br>DUN & BRADSTREET, INC.,<br><br>Defendant. | Case No. 24-cv-06002-JST<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: ECF No. 42 |

Before the Court is Defendant Dun & Bradstreet, Inc.'s motion for summary judgment. ECF No. 42. The Court will grant the motion in part and deny it in part.

## I.    BACKGROUND

Plaintiff Dana Sanderson alleges that Dun & Bradstreet unlawfully terminated him based on age. He held various sales roles at D&B from 2005 to 2009, and again from 2011 or 2012 until February 2023.[1] He worked primarily with D&B's Sales and Marketing Solutions ("S&MS") products, and his last position was as a Specialist III. Chris Garza promoted him to that position effective January 1, 2022, when Sanderson was 63 years old. Specialists "partnered with D&B Account Executives on deals where special expertise in one of D&B's suite of business solutions was needed." ECF No. 46 ¶ 10.

Four times during his tenure at D&B—in 2016, 2017, 2018, and 2020—Sanderson received an award as a top-performing employee based on exceeding his sales target. Although he

---

[1] Sanderson's rehire date is not clear from the record. D&B has submitted a declaration stating that Sanderson was rehired in 2011, ECF No. 46 ¶ 6, but Sanderson's opposition brief states that he was rehired in 2012, ECF No. 47 at 6; *see also* ECF No. 47-2 at 6 (transcript of Sanderson's deposition, where he was asked about his supervisor when he "came to work for Dun & Bradstreet in 2012").

did not achieve his sales target in 2019 or 2021, he hit 114% of his target for 2022. A portion of his sales credit in 2022 was attributable to a deal on which Sanderson acknowledges doing no work, but he explains that the credit was "for business that was folded into one of my accounts as a result of an acquisition," and that "this credit was not unique to me. The entire account team, including Mr. Garza, also received credit for the deal. This allocation of credit was routine and consistent with common practice." ECF No. 47-29 ¶ 9.

In the years leading up to his termination, Sanderson's performance reviews varied. In both 2019 and 2021, he received a rating of "4 – Progressing," the second-lowest rating on D&B's five-point scale. But, in 2020, he received the highest rating of "1 – Role Model." He had not received his evaluation for 2022 at the time of his termination, but Garza ultimately rated him as "3 – Key Contributor." Garza gave two other people in his group the same rating; three received a lower rating; and only one received a higher rating.[2]

Garza, as well as two people on the Account Executive side, criticized Sanderson in 2022 regarding his ability to bring in new clients. While there is no evidence in the record regarding criticism of other Specialists by Account Executives, Garza testified that he coached everyone on his team "on how to prospect new contacts." ECF No. 47-10 at 7. For example, Garza wrote in one Specialist's performance review that he wanted the employee "to be more of a demand creator through his own prospecting efforts"; that "[t]he need for more prospecting activity has been a key theme in conversations with [the employee]"; and that the employee should "make [prospecting] a higher priority to ensure [he] has enough pipeline to finish 2022 successfully." ECF No. 50-4 at 6. Garza does not remember if he did "anything to assess or break out [his employees'] new business from their total attainment." *Id.* at 8.

Sanderson recalls being told that his job had been eliminated during a February 14, 2023 phone call, which lasted less than five minutes, with Garza and an HR representative. He was not

---

[2] Sanderson's opposition brief states that "four Specialists received lower ratings than Plaintiff." ECF No. 47 at 13. The cited exhibit includes only three individuals evaluated by Garza as "4 – Progressing." ECF No. 50-5 at 3, 8, 34. It includes evaluations for two other individuals with that rating, but those evaluations were not completed by Garza, and Sanderson does not explain why one but not the other of those evaluations should be considered as a comparator.

told that the Specialist role was being eliminated. Sanderson was approximately six weeks younger than 65 at the time of his termination.

The same day that Sanderson was terminated, Garza held a virtual meeting for the Specialists who reported to him. Sanderson did not attend the meeting. Sanderson's former colleague, Robert Berg, testified that it was not announced at the meeting that the Specialist position was being eliminated "[b]ecause we were simply moving to the sales and marketing team under Kim Ciccarelli." ECF No. 47-3 at 9.

That meeting was followed by a broader "sales kick off meeting" at which slides were shown "for sales performance for 2022" and "all the new teams and showing . . . who's reporting to whom on each of those teams." *Id.* at 12–13. The slides showed that Sanderson hit 114% of his sales target for 2022, and that some teams had open positions. Sanderson was one of only two people on his team to reach more than 100% of their sales targets for 2022.

D&B characterizes Sanderson's termination as part of a "reorganization of its sales organization, which was referred to internally as a 'go-to-market' reorganization (the 'GTM reorganization')" and "was prompted by the business need to have a more dedicated focus on the sale of new business." ECF No. 46 ¶ 9. Michelle Poltrock, one of D&B's senior HR directors, stated that the Specialist role was eliminated as part of the GTM reorganization, and "two new roles were created: a New Business Sales Executive ('NBSE') position . . . and a Subject Matter Expert ('SME') position." *Id.* ¶ 10.

As part of the GTM reorganization, 78 out of 87 Specialists were assigned new roles.[3] Sanderson was one of nine Specialists who were terminated, along with two other sales employees. He was one of six Specialists over the age of 60, two of whom were terminated. D&B's analysis showed that the percentage of sales workers over the age of 40 increased slightly after the reorganization, but the analysis did not consider the impact on more stratified age groups,

---

[3] The parties appear to agree that there were 87 Specialists prior to the GTM reorganization. *See* ECF No. 46 ¶ 11 (submitted by D&B); ECF No. 47-1 ¶ 8 (submitted by Sanderson). However, Sanderson also submitted an economist's declaration stating, "There were 74 employees working with a Specialist job title to compare with Mr. Sanderson." ECF No. 47-36 ¶ 4. Sanderson does not explain this discrepancy, but it is not material.

such as those over the age of 60. Berg, who also worked under Garza, was approximately one week younger than Sanderson and was not terminated. The other Specialists in Garza's group who were not terminated were 12 to 24 years younger than Sanderson.

Poltrock testified that leaders "took a look at the new roles to be created" and

> considered their current teams and who had demonstrated those specific skills that would be most relevant for each of those roles, as well as considering total attainment, new business attainment, sales activity, taking a look at someone's past performance over time. Not just their number, but their specific skills and what they were good at or maybe not as strong at, to make the determination as to which role they would go into, if any.

ECF No. 47-5 at 13–14. She said the decisionmakers "did not discuss or consider the ages of employees in any of the decision-making involved in the GTM reorganization." ECF No. 46 ¶ 14. Instead, according to Poltrock, Sanderson was not selected to stay on as an NBSE because he "had not demonstrated the new-business sales skills and abilities needed for a role that was to be focused exclusively on new business." *Id.* In his declaration, Garza similarly stated, "I did not recommend Mr. Sanderson for a NBSE role because, based on my experience supervising him, I felt that he had not been successful in creating, driving, and closing new business." ECF No. 45 ¶ 18. He further declared, "I did not take Mr. Sanderson's age into account, and his age played no role whatsoever in my thinking. I did not even know Mr. Sanderson's age at the time I shared my opinion regarding his skills." *Id.*

Only two SME positions focused on the S&MS products in which Sanderson had expertise. According to Poltrock, Sanderson was not selected for those roles

> because the sales leaders involved in the GTM reorganization determined that Mr. Sanderson had demonstrated less product-specific and industry-specific expertise than the former Specialists Corey Baker and Robert Carter, who were ultimately selected for the two SME positions focused on the S&MS suite of business solutions. Carter also had been with the company longer than Mr. Sanderson.

*Id.* ¶ 13. Both Baker and Carter were more than ten years younger than Sanderson, and Baker had only been with D&B since January 2022. Poltrock testified that both Carter and Baker "were called out as having better experience and ability as potential SMEs," without giving any specifics. ECF No. 42-9 at 37–38. Garza added that Baker had "some experience working for a

4

wireless company," which D&B thought would be valuable given its "very large customers, specifically like AT&T and T-Mobile and Verizon." ECF No. 42-6 at 12.

After Garza learned that Sanderson was not selected to fill either an NBSE or an SME role, he asked Sanderson's former manager, Tom Moore, if he would consider hiring Sanderson back as an Account Executive, one of the positions Sanderson held before being promoted to a Specialist. Moore declined, explaining that Sanderson's "lack of digital background and his singular expertise in S&MS vs the other 2 disciplines makes me believe I have better candidates to fill open roles." ECF No. 45 at 43.

It is not disputed that "Specialists received commissions on both contract renewals and new business. By contrast, employees in the newly-created NBSE role only received commissions on sales of new business." ECF No. 46 ¶ 12. But there is some dispute over whether the job responsibilities changed when the GTM reorganization transferred many Specialists to the NBSE role. For example, one of Sanderson's former colleagues, Michael Welch, testified that new business was "always a focus," even before the reorganization, and that "new business can occur with existing clients" in the form of, for example, selling a new product or "expanding an existing product with a fuller sweep of that product." ECF No. 47-4 at 7–9. He further testified, "although the job title had changed and the descriptions and responsibilities had moved from renewals and growth to strictly new business, the account assignment and roughly the reporting structure, although not the person who was in the job, remained the same." *Id.* at 9–10. Similarly, Berg testified, "It was common practice for D&B to change titles," and "the comp[ensation] plan varied each time there was a reorganization." ECF No. 47-3 at 5, 7. He did not recall whether his job title changed after the reorganization, "but we were the sales and marketing. That's what we did. Sales and marketing sales specialist. I don't remember what my exact title [was]." *Id.* at 6, 9–10. Although "[n]ew business was a big focus" after the reorganization, Berg did not "understand new business to be different from renewal business" and explained that "new business could be selling a brand new product that the customer doesn't use today or didn't use yesterday. It can also be expanding a renewal of an existing product that they use but now expanding more the full sweep of the product." *Id.* at 6–7. A "critical" part of the role was "helping to secure renewals whether

United States District Court
Northern District of California

5

[we] were paid on it or not." *Id.* at 14.  The compensation plan changed "so that we weren't comped on renewals anymore, and only comped on new business," which "was a real gripe that everybody on the specialist team had, because they were saying this is a raw deal.  We are still doing all the same hours and work and pricing and relationship building that where the renewals wouldn't get across the finish line without our involvement, and now we're not getting paid on it." *Id.* at 27.  More generally, Sanderson testified that "throughout [his] career, there were multiple reorgs and a lot of different titles applied to the same roles."  ECF No. 47-2 at 12.

Ciccarelli confirmed to Berg that she had "two openings" and was "actively interviewing candidate[s]" at the time of Sanderson's termination.  ECF No. 47-3 at 22.  When Berg raised the question of why Sanderson "wasn't made part of our team when he is 114 percent of plan" and said Sanderson was "a valuable team member," Ciccarelli "said that she didn't know anything about his . . . termination."  *Id.* at 23.  D&B does not dispute that these positions were open but argues that they were for NBSE and not Specialist positions, and the company had already determined that Sanderson lacked the new-business skills required for an NBSE role.  One of the persons subsequently hired as an NBSE, who was given the same account assignment as Sanderson once had, was 25 years younger than Sanderson.  Because of the account assignment, Welch considered this person to have filled a role that was "similar to" and "the continuation" of Sanderson's role.

D&B's intranet contained a job posting for an S&MS Specialist around the time of Sanderson's termination.  According to Poltrock, this posting "was not for any open S&MS Specialist role" and should never have been posted:

> On February 23, 2023, I was informed that the posting had somehow been posted as an "evergreen" posting despite my rejection of it in September 2022.  An "evergreen" posting is one that is used by D&B Recruiting to attract candidates the company might want to recruit down the road if an actual opening were subsequently created.  Upon learning that the posting existed on the intranet despite my rejection of it and despite the fact that no one was recruiting for an S&MS Specialist role at all, I instructed that it be taken down.

ECF No. 46 ¶ 16.  Berg also testified that he and Sanderson discussed how the posting "didn't make sense" because it listed Garza as the hiring manager even after he was moved to a different

United States District Court
Northern District of California

area, so Berg thought "it appeared like they hadn't updated it on the job posting website."  ECF No. 42-8 at 14.

D&B's sales team underwent another reorganization in 2025.  The number of NBSEs was reduced from 60 to approximately 6, and the Specialist role was reinstated.  The majority of the employees who transferred from the NBSE III to the Specialist III role were ten or more years younger than Sanderson.

Sanderson alleges three claims against D&B based on his termination: age discrimination in violation of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940(a); failure to prevent discrimination in violation of FEHA, Cal. Gov't Code § 12940(k); and wrongful termination in violation of public policy.  D&B has moved for summary judgment on all three claims.

## II.    JURISDICTION

The Court has diversity jurisdiction under 28 U.S.C. § 1332.

## III.   LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is genuine only if there is sufficient evidence "such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material only if it might affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When deciding a motion for summary judgment, the court must draw "all justifiable inferences" in the nonmoving party's favor and may not weigh evidence or make credibility determinations.  *Id.* at 255.

Where the party moving for summary judgment would bear the burden of proof at trial, that party "has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000).  Where the party moving for summary judgment would not bear the burden of proof at trial, that party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire &*

United States District Court
Northern District of California

*Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. *Id.* at 1102–03. It is not the court's duty "to scour the record in search of a genuine issue of triable fact"; instead, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). If the nonmoving party fails to make the required showing, the moving party is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV.  DISCUSSION

### A.  Age Discrimination

Sanderson first claims that D&B terminated him because of his age, in violation of FEHA.

> Because state and federal employment discrimination laws are similar, California courts apply the *McDonnell Douglas* burden-shifting framework to analyze disparate treatment claims under FEHA.
>
> Under the three-part *McDonnell Douglas* test, the plaintiff first bears the burden of establishing a prima facie case, which raises a presumption of discrimination. The burden then shifts to the employer to rebut this presumption by producing admissible evidence sufficient to show that its action was taken for a legitimate, nondiscriminatory reason. If the employer sustains its burden, the presumption established in the first step disappears, and the plaintiff must raise a triable issue suggesting that the employer's proffered reason is mere pretext for unlawful discrimination, or offer other evidence of discriminatory motive. Despite this intermediate shifting of the evidentiary burdens, the ultimate burden of persuasion remains with the plaintiff.

*Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145–46 (9th Cir. 2017) (citation modified) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). A prima facie case requires a plaintiff to show that:

> (1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317, 355 (2000). In some cases, "a prima facie inference of discrimination can arise from evidence that during a work force reduction, a satisfactory age-

protected worker was laid off, while younger employees were retained in similar jobs, or were reassigned to positions for which the plaintiff also qualified." *Id.* at 367.

In this case, D&B does not dispute that Sanderson is a member of a protected class or that he would not have been terminated if not for the GTM reorganization, which, according to D&B, eliminated the Specialist position and created new positions requiring different skills. However, as noted above, there is some dispute over whether NBSEs performed the same functions as Specialists did prior to the GTM reorganization, even though NBSEs were compensated differently by not receiving credit for renewal business. Having reviewed the evidence, the Court finds this dispute to be genuine and material—i.e., that there is "a triable issue whether the claim that defendant eliminated plaintiff's position was true or untrue." *Kelly v. Stamps.com, Inc.*, 135 Cal. App. 4th 1088, 1099 (2005). If a jury were to decide that NBSEs performed the same functions as Specialists, then it might also conclude that D&B terminated Sanderson based on his age because significantly younger employees and employees with lower performance ratings, experience, and attainment of sales targets were retained while Sanderson was not. A jury might also be persuaded by the fact that the person hired to take over Sanderson's accounts was 25 years younger. *See, e.g.*, *France v. Johnson*, 795 F.3d 1170, 1174 (9th Cir. 2015) (holding that "an average age difference of ten years or more between the plaintiff and the replacements will be presumptively substantial").

To be sure, some of the evidence on which Sanderson relies is weak. For example, comments from Sally Slarke from five years prior to Sanderson's termination regarding wanting to bring in people with "less legacy [who] would be more adaptable to change," ECF No. 47-4 at 12, are not necessarily related to age. *E.g.*, *Cozzi v. County of Marin*, 787 F. Supp. 2d 1047, 1059 (N.D. Cal. 2011) (noting that "fresh faces" is "not necessarily an age-based comment" because "[a]ge and years of service are distinct"). Moreover, Slarke was not one of the decisionmakers and, in fact, had recommended that Sanderson stay on as an SME with a secondary recommendation that he be an Account Executive.

However, it is not the Court's role at this stage to weigh the evidence. Viewing the evidence in a light most favorable to Sanderson, as the Court must on this motion, the Court

cannot conclude that no reasonable juror could find for Sanderson on his age discrimination claim. D&B's motion for summary judgment on this claim is therefore denied.

### B.    Failure to Prevent Discrimination

Sanderson's next claim is for failure to prevent discrimination. Sanderson does not contest that D&B "maintained and disseminated to employees policies that prohibit discrimination on the basis of age, as well as other protected characteristics," and that these policies are made available on the company's intranet and are the subject of employee training. ECF No. 46 ¶¶ 3–5. D&B's non-discrimination policy states that an employee who believes they have been a victim of discrimination "has a responsibility to report his/her concerns." *Id.* at 9. Once a report is made, "[a]n appropriate investigation will take place and corrective action, up to and including termination, will be implemented as appropriate." *Id.*

Sanderson does not argue that D&B's non-discrimination policy is inadequate. Instead, he asserts that D&B is liable for failure to prevent discrimination because it did not initiate an investigation, as the policy specifies it would, after he complained of age discrimination. He claims that he made that complaint in a March 17, 2023 email that he sent to Shannon Bull, one of D&B's HR representatives, in response to D&B's proposed severance agreement. That email reads, in its entirety:

> Hi Shannon,
>
> Wow, that is not the reply I would have expected. I am shocked and disappointed the company would not grant me an extension to seek legal counsel, especially since the company advised me to do so in the paperwork I received last month.
>
> Since notification of the "elimination of my position", I have been very upset, feeling unsettled, stressed out and basically still in shock as to what happened and why. Some of the things I am experiencing such as low morale, disrupted sleep and unusually high anxiety are very unfamiliar to me and I can only attribute it to this unsettling situation.
>
> Additionally, because I am approaching retirement age and planned on retiring with D&B in the next five years I've thought long and hard about the many years I have worked for the company as well as my dedication and excellent performance record. These facts have raised a lot of questions and skepticism about my termination which have gone unanswered by D&B leadership. To think that the company has refused to grant me the common courtesy of an

extension so I can consult with an attorney only adds to my concerns about what I believe to be a questionable termination.

Perhaps we can reconvene next week and revisit this.

Thank you

Dana

ECF No. 42-12 at 8.  Bull responded, "The Career Transition Plan is an ERISA plan with set offer expiration deadlines.  If you come back to us after March 31, we can review your request but we cannot ensure that you would still be eligible for the CTP benefits as the original CTP offer will have expired and be void."  *Id.*  Sanderson testified that he also spoke with Bull by phone and expressed feelings of "[s]hock, unanswered questions, being treated unfairly, humiliation, [and] surprise."  ECF No. 47-2 at 26.

As D&B correctly observes, Sanderson's "email was a request by Plaintiff that he be given additional time to respond to the severance offer the company had made him."  ECF No. 42 at 31.  While Sanderson mentioned that he was "approaching retirement age and planned on retiring with D&B in the next five years," and that he might consult an attorney to discuss what he "believe[d] to be a questionable termination," ECF No. 42-12 at 18, he did not mention potential age discrimination.  Nor is there any evidence that Sanderson raised age discrimination claims elsewhere, such as when he spoke with Bull by phone.  To the contrary, Sanderson testified, "I never told [Bull] that I had been discriminated against."  ECF No. 42-2 at 81.  On these facts, there is no genuine dispute over whether Sanderson raised a complaint of age discrimination that triggered D&B's duty to investigate, and D&B is entitled to summary judgment on Sanderson's claim for failure to prevent discrimination.

### C.    Wrongful Termination in Violation of Public Policy

D&B's only argument in favor of summary judgment on Sanderson's third claim, for wrongful termination in violation of public policy, is that it fails because Sanderson cannot prevail on his FEHA discrimination claims.  "Under California law, if an employer did not violate FEHA, the employee's claim for wrongful termination in violation of public policy necessarily fails." *Featherstone v. S. Cal. Permanente Med. Grp.*, 10 Cal. App. 5th 1150, 1169 (2017).  However, as discussed above, D&B is not entitled to summary judgment on Sanderson's age discrimination

11

United States District Court
Northern District of California

claim. The Court therefore also denies D&B's motion for summary judgment on his claim for wrongful termination in violation of public policy.

**CONCLUSION**

For the above reasons, D&B's motion for summary judgment is granted in part and denied in part. The motion is granted as to Sanderson's claim for failure to prevent discrimination and denied as to his claims for age discrimination and wrongful termination in violation of public policy.

**IT IS SO ORDERED.**

Dated: May 18, 2026



JON S. TIGAR
United States District Judge